**Louis TANTALO, Plaintiff-Appellant,**

v.

**ARVIN INDUSTRIES, INC., Defendant-Appellee.**

**No. 15040.**

United States Court of Appeals
Seventh Circuit.

April 18, 1966.

Martin M. Sheinman, Morris, Safier & Teitelbaum, Pittsburgh, Pa., for appellant.

R. Stanley Lawton, F. Boyd Hovde, Indianapolis, Ind., Ice, Miller, Donadio & Ryan, Indianapolis, Ind., of counsel, for appellee.

Before SCHNACKENBERG, KNOCH and SWYGERT, Circuit Judges.

KNOCH, Circuit Judge.

Plaintiff, Louis Tantalo, brought this action in the United States District Court to recover damages for personal injury allegedly caused by the negligence of the defendant, Arvin Industries, Inc., in binding its automobile tailpipes together for shipment to a purchaser.

Plaintiff alleged in its complaint that he was employed in loading and unloading trucks at the terminal of his employer, Bell Lines, Inc., in Pittsburgh, Pennsylvania. The defendant shipped a number of bundles of tailpipes from its Seymour, Indiana, facility to a warehouse of Ford Motor Company in West Mifflin, Pennsylvania, wired together in bundles of five. These bundles of tailpipes arrived at the terminal of Bell Lines on or about January 15, 1962.

Plaintiff had previously handled tailpipes manufactured by the defendant, which were bundled in the same way, over the several years of his employment. He testified that he had previously experienced the breaking of the wire fastenings, and he knew they were subject to breaking while being handled. He testified that when directed to do so by his supervisor, he had balked at helping to remove the tailpipes from a trailer because he saw no reason to unload them only to reload them a short time later.

He did not protest on the score of any risk or danger, although he testified that such risk was in his mind at the time. The unloading was accomplished without incident, and plaintiff began to reload another trailer with cartons of miscellaneous items and bundles of tailpipes. When that trailer was loaded as high as plaintiff's head, he tried to throw a bundle of tailpipes on top of the load. As he was lifting the bundle up, it broke apart. He was not sure whether the wire broke or whether it slipped off the end of the bundle. One pipe struck him in the leg. He testified that he worked the rest of that day and the two following days, but that on the third day after the incident, he saw a doctor. He learned then that he had a ruptured artery in the leg. Ultimately, his leg had to be amputated.

The jury brought in a verdict for the defendant, and this appeal was taken.

The sole witness to the occurrence which allegedly resulted in plaintiff's loss of his leg was the plaintiff himself. At the trial, plaintiff testified that he was under the influence of narcotics at the time of the accident and also at the time of the trial.

Leslie A. Seversen, who had been engaged in the field of packaging and material handling for 35 years, testified that the established industry practice in 1962 was to wire pipe together in bundles of 3 and 5; that most firms used 16, 17, or 18 gauge wire, and that the defendant was the only firm he knew which was using the heavier 14-gauge wire at that time. It was his expert opinion that the defendant's method of securing the pipes together for shipment was adequate.

Wallace F. Benson, an engineering expert witness, testified that the wire and method used by the defendant produced a safety factor of 5.5 and that a factor of only 3 would have been adequate.

In the course of pretrial discovery, plaintiff addressed a number of interrogatories to the defendant, which included the following:

"10. Please state the exact *manner* in which tailpipes were packaged or bundled which were shipped by Arvin Industries, Inc. to their customers including Ford Motor Co. in West Mifflin, Pennsylvania at or about the time the accident herein alleged.

a. During what period of time were tailpipes so packaged or bundled.

b. Has there been any changes made at any time in the bundling of tailpipes, if so when and for what reasons were they made." [Emphasis added]

The defendant's answer was:

"10. The defendant bundled its tailpipes in a way specified by the particular customer for whom the order was being prepared. In the case of non-production parts being shipped to Ford Motor Company, these tailpipes were wired together in bundles of 3-5.

a. Packaging has been approximately the same for the past twenty years."

In the five months between the filing of the answer to this interrogatory and the trial, plaintiff raised no objection to the answer and requested no relief from the Court.

In oral argument in this Court, plaintiff's counsel explained that when plaintiff was informed that Ford's instructions included a suggestion for 16 gauge wire, plaintiff concluded from the answer quoted above (that no change had been made in the *manner* of packaging) that 16 gauge wire had been used, which plaintiff considered to be insufficiently heavy. Plaintiff was thus surprised to learn at the trial that the heavier 14 gauge wire was in fact used. Plaintiff wished to advise the jury that he had been misled by the form of the answer to interrogatory 10 and hence had been surprised at the trial. Plaintiff cites as error the Trial Judge's refusal to allow that statement to be made to the jury in the course of plaintiff's argument at the conclusion of the trial. We cannot see that plaintiff was in anyway prejudiced by the Trial Court's ruling.

Plaintiff also contends that the Trial Judge erroneously instructed the jury on the doctrine of assumption of the risk. The instruction read:

"The 'assumption of risk' defense set forth in the defendant's third defense is generally defined as the voluntary act of any ordinary prudent man who, for hire, takes the chance of a known or obvious danger incident to his performing the duties of his employment, which danger he fully comprehends.

"If you find that Mr. Tantalo, at the time he first went to work, or during the period of employment, or on the day in question, knew and learned prior to the happening of the tendency of bundles of exhaust pipes to separate in transit and in handling by freight handlers which presented a present risk and danger of a bundle or of a part of the contents to strike and injure a freight handler, and you further find that Mr. Tantalo accepted and was performing the work assignment with this knowledge when a bundle broke injuring Mr. Tantalo, then I instruct you that Mr. Tantalo assumed the risk of the undertaking and his injuries if they proximately resulted therefrom. This is so, even if he undertakes the assignment by reason of a threat of and actual fear of losing his employment, or of incurring the displeasure of his employer, Bell Lines, Inc., as such is insufficient reason to overcome the defense of assumption of risk.

"However, if you find that Mr. Tantalo never knew that there was a risk, or did not comprehend the danger of the bundle breaking and injuring him prior to his handling it, or if you find that Arvin Industries, Inc., has failed to prove any one of the essential elements and facts as set forth in instruction number 4, you will find for Mr. Tantalo as to the third defense of defendant's answer."

There is no record of a specific objection to this instruction. In oral argument, counsel stated that there was a general assertion that assumption of the risk was not a proper defense under Pennsylvania law, and plaintiff requested that the Court give contrary instructions which were refused. It is plaintiff's theory that the law of Pennsylvania, which is admittedly controlling here, restricts the doctrine of assumption of the risk to suits brought against employers by their employees.

We find this position untenable. The doctrine of assumption of the risk has been applied by Pennsylvania courts, and by federal courts sitting in Pennsylvania and citing Pennsylvania law, in numerous cases involving no master-servant relationships. Schentzel v. Philadelphia National League Club, 1953, 173 Pa.Super. 179, 96 A.2d 181 (spectator at baseball game struck by ball); Shula v. Warren, 1959, 395 Pa. 428, 150 A.2d 341 (spectator at race track struck by car); Hall v. Ziegler, 1949, 361 Pa. 228, 64 A.2d 767 (man falling from bumper of car); Earll v. Wichser, 1943, 346 Pa. 357, 30 A.2d 803 (man thrown from truck tailgate); Horvath v. Morrison, 1942, 344 Pa. 434, 25 A.2d 324 (woman's hand caught in wringer); Hild v. Montgomery, 1941, 342 Pa. 42, 20 A.2d 228 (man injured by car while walking up narrow garage ramp); Hotchkin v. Erdrick, 1906, 214 Pa. 460, 63 A. 1035, 10 L.R.A.,N.S., 506 (employee of independent contractor falling from chimney ladder); Spanoudakis v. Aluminum Co., 1960, 401 Pa. 460, 165 A.2d 241 (employee of painting contractor falling when ventilation duct gave way); Witcjak v. New Franklin Coal Mining Co., D. C., E.D., Pa., 1959, 173 F.Supp. 661 (employee of construction company injured when moving equipment owned by defendant). *Hotchkin, Spanoudakis* and *Witcjak* all involved injured persons suing third parties for injuries sustained during the course of their employment. In a similar case, Harvey v. Eimco, D.C., E.D., Pa., 1963, 32 F.R.D. 598, the defendant was allowed to plead assumption of the risk over objection of the plaintiff.

The judgment of the District Court is affirmed.

Affirmed.